# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

———————————

## No. ACM 38765

———————————

### UNITED STATES
*Appellee*

**v.**

### Robert A. CONDON
Technical Sergeant (E-6), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 10 March 2017

———————————

*Military Judge:* Wendy L. Sherman (arraignment) and Vance H. Spath.

*Approved sentence:* Dishonorable discharge, confinement for 30 years, forfeiture of all pay and allowances, and reduction to E-1. Sentence adjudged 25 September 2014 by GCM convened at Hurlburt Field, Florida.

*For Appellant:* Major Johnathan D. Legg, USAF; Philip D. Cave, Esquire.

*For Appellee:* Major Mary Ellen Payne, USAF; Gerald R. Bruce, Esquire.

Before DUBRISKE, MAYBERRY, and J. BROWN, *Appellate Military Judges*.[1]

Senior Judge DUBRISKE delivered the opinion of the Court, in which Senior Judge MAYBERRY joined. Senior Judge J. BROWN filed a separate opinion concurring in part and dissenting in part.

———————————

[1] This special panel was appointed by former Chief Judge Allred prior to his retirement. Upon his arrival, Chief Judge Drew recused himself from this case and was not involved in any capacity.

---

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

---

DUBRISKE, Senior Judge:

Appellant was tried at a general court-martial composed of officer and enlisted members. Contrary to his pleas, he was found guilty of dereliction of duty, rape by fear of grievous bodily harm, sexual assault of a second victim based upon her inability to consent due to alcohol consumption, stalking, forcible sodomy, assault consummated by a battery, false imprisonment, and obstruction of justice, in violation of Articles 92, 120, 120a, 125, 128, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 892, 920, 920a, 925, 928, 934.[2] The members sentenced Appellant to a dishonorable discharge, 30 years of confinement, forfeiture of all pay and allowances, and reduction to E-1. The convening authority approved the sentence as adjudged.

Appellant raises 21 assignments of error for our review in his multiple pleadings to this court. After reviewing the record of trial and the initial briefs from the parties, the court specified an additional issue related to the prosecution's sentencing argument:

> Did the military judge err to the prejudice of Appellant when instructing the members that Appellant's status as an Air Force Office of Special Investigations (AFOSI) agent was an aggravating factor for sentencing, without further clarifying that the status must be connected to each particular offense or constitute an abuse of his position, and, if so, was the prejudicial impact of this instruction further exacerbated by trial counsel's argument that the members should hold Appellant to a higher standard because he was an agent?

After considering all 15 issues personally raised by Appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), we find 12 of those issues require no additional analysis or warrant relief.[3] *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

---

[2] Appellant was found not guilty of additional specifications of sexual assault alleged against a third victim.

[3] The additional issues raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and not discussed further in this opinion are:

*(Footnote continues on next page)*

The remaining issues raised by Appellant, either personally or through counsel, and addressed in this opinion, are:

1. Whether the evidence is factually insufficient;

2. Whether Article 120(b)(3)(A), as applied in Specification 4 of Charge I, is unconstitutionally vague;

3. Whether the military judge abused his discretion in failing to grant the Defense challenge to Major (Maj) AF for implied bias;

4. Whether the military judge erred, or, alternatively, counsel were ineffective, for failing to question a victim about a prior inconsistent statement regarding her desire to have sex with Appellant;[4]

5. Whether the military judge's findings instructions on consent and intoxication were improper and prejudiced Appellant;

---

1. Whether the military judge erred in allowing testimony about Appellant's involvement with "Iron Order";
2. Whether the military judge erred in failing to conduct an in-camera review and disclose sexual assault response coordinator interview notes;
3. Whether the military judge erred in failing to disclose mental health records of JD;
4. Whether the military judge erred in failing to dismiss the charges, or to provide additional peremptory challenges for the defense, stemming from the Defense's allegation of unlawful command influence;
5. Whether Appellant was denied a speedy trial in violation of the Fifth Amendment and Article 10, UCMJ;
6. Whether the record is not substantially verbatim in that the audio of Appellant's statements to OSI were not properly transcribed;
7. Whether there was an irreconcilable conflict of interest between the Defense-retained expert and the later retained Government expert; the Defense did not object, but there is no knowing voluntary waiver of the conflict and it gives the appearance of an unfair trial;
8. Whether it was error to admit testimony about texts on cell phones, where the complaining witness had possibly deleted those texts, the Government failed to retrieve them, and where his own cell phone chip was permanently destroyed; thus the spoliation of evidence deprived Appellant of a fair trial;
9. Whether the military judge erred in allowing testimony under Mil. R. Evid. 413;
10. Whether the military judge erred in denying the Defense request to present evidence under Mil. R. Evid. 412 and in failing to compel expert assistance in "alternative sexual lifestyles, specifically BDSM";
11. Whether the military judge erred in instructing the members that if they were firmly convinced that the accused was guilty of any offense charged then they must, rather than should, find him guilty; and
12. Whether the military judge erred in allowing testimony from Colonel WW during sentencing.

[4] Issue raised pursuant to *Grostefon*, 12 M.J. 431.

6. Whether the Government's findings and sentencing argument were improper;[5]

7. Whether trial defense counsel failed to provide effective assistance of counsel during sentencing when they failed to respond to the testimony of the Government expert in sentencing and failed to obtain a psychosexual examination of Appellant;

8. Whether the military judge erred in allowing the complaining witnesses to provide unsworn statements during sentencing;[6]

9. Whether the sentence was inappropriately severe.[7]

We have considered these assignments of error and the specified issue. We find no error warranting relief occurred during the findings portion of the trial. As to sentencing, we find the prosecution's argument that Appellant should be held to a "higher standard" because of his status as an AFOSI agent was improper. However, as we find this error did not prejudice Appellant, we now affirm.

## I. BACKGROUND

Appellant was a special agent (SA) with AFOSI. His offenses challenged on appeal primarily involved two female military members with whom Appellant had dating relationships between December 2012 and September 2013.

Appellant's misconduct first came to light in early September 2013 when his girlfriend at the time, Airman First Class (A1C) ML, alleged that Appellant sexually assaulted her after she refused to engage in sexual activity with him. A1C ML testified that Appellant choked and slapped her repeatedly, and then ordered her to engage in intercourse and oral sex.

A1C ML first met Appellant when she responded to Appellant's personal, on-line advertisement seeking a partner for a long-term dominant/submissive relationship. A1C ML responded that she had previously experimented with bondage, discipline, sadism, and masochism (BDSM), and was interested in getting to know him. After exchanging text messages for approximately a month, they met in person in August of 2013. They engaged in a consensual sexual relationship for approximately a month. During the course of this re-

---

[5] Appellant's concerns about the Government's sentencing argument are addressed in conjunction with the specified question from the court.

[6] Issue raised pursuant to *Grostefon*, 12 M.J. 431.

[7] Issue raised pursuant to *Grostefon*, 12 M.J. 431.

lationship, Appellant instructed A1C ML in how to conduct herself as the submissive partner.

Though aspects of their sexual relationship had included playful spanking, the use of a paddle, and other dominant or submissive themes, A1C ML testified that the forced sexual conduct in September 2013 was unlike any of the consensual submissive sexual activity she had previously engaged in with Appellant. After this non-consensual incident, A1C ML drove to a local hospital, but left when she learned she would be required to file a police report. She then went to the Eglin Air Force Base medical facility and reported the incident. She initially requested a restricted report, where investigators are not notified of the allegation, but later requested to make her report unrestricted.

As AFOSI investigated A1C ML's allegations, they discovered allegations of other sexual misconduct by Appellant against a second female—an AFOSI agent, SA AD. Appellant and SA AD met in December 2012. SA AD was a new agent at the AFOSI detachment at Hurlburt Field, Florida, and Appellant became her supervising agent. From their on-duty, professional relationship, they began an "on again, off again" romantic relationship. Shortly thereafter, SA AD was reassigned to a different AFOSI detachment at a nearby installation in Florida, but their relationship continued after SA AD's departure.

The relationship was at times volatile. SA AD testified that Appellant was very controlling and possessive of her. Appellant would repeatedly call her, yell at her, and follow her when she was off-duty. In April 2013, SA AD decided to end the relationship with Appellant. This culminated with Appellant going to SA AD's AFOSI detachment one evening while she was alone finishing up her work. Appellant followed SA AD from room to room until he cornered her and kept her there against her will. Despite the volatile relationship and break-up, SA AD remained friends with Appellant. He later deployed, and they continued to keep in contact.

On 30 August 2013, after Appellant returned from his deployment, SA AD and her friends went to a local bar. Though it was not previously arranged, Appellant later arrived at the same bar and socialized with SA AD. Over the course of the evening, SA AD became intoxicated and began to flirt with Appellant. SA AD's friends eventually drove her home and assisted her into her house because of her level of intoxication. After her friends left, SA AD texted Appellant and asked him to come over to her house. SA AD has little recollection of what occurred next, though based upon Appellant's text messages, it appears he entered her apartment around 0051 that morning and departed less than an hour later at 0134. Around 0400 in the morning, SA AD woke up nude and alone in her bed, on top of her sheets, with semen residue on her

stomach. Although she had little recollection of what had occurred while Appellant was at her residence, she believed Appellant had sexual intercourse with her. Appellant's subsequent discussions with her about that night confirmed her belief that he in fact had sexual intercourse with her.

During the investigation of these allegations, Appellant engaged in additional misconduct. Appellant contacted several potential witnesses despite an order prohibiting him from doing so, and he threatened to ruin SA AD's reputation as an AFOSI agent if she cooperated in the investigation. Around the same time, SA AD found a military assault rifle sighting target on her doorstep. Appellant also attempted to impede AFOSI's investigation against him by asking his mother to move his vehicle off-base and to remove his personal laptop from his residence to prevent a government search.

Investigators also discovered evidence of two other sexual assaults which were not charged but eventually offered at trial to demonstrate Appellant's propensity to commit sexual assaults. The first involved SA AD who claimed that at the beginning of their relationship, while on a trip to New Orleans, Appellant had sex with her while she was too intoxicated to recall what occurred. The second involved Appellant's ex-wife where she claimed, approximately ten years prior to the charged offenses, Appellant forced her to engage in sexual activity with him after she told him she did not want to do so.

## II. DISCUSSION

### A. Factual Sufficiency

Appellant contends the evidence is factually insufficient to sustain his convictions of rape, forcible sodomy, and assault involving A1C ML, as well as the sexual assault and stalking offenses involving SA AD.

We review issues of factual sufficiency de novo. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant's] guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

### 1. Offenses Involving A1C ML

As to A1C ML, Appellant argues the physical assault as reported by A1C ML would have been overheard by neighbors and that she would have sus-

tained greater injuries than those observed during her medical examination. Appellant also attacks A1C ML's credibility and re-raises many of the same arguments made and rejected by the members at trial.

Appellant's neighbor testified that she did not recall hearing anything unusual the night of the incident. In addition to potentially contradicting A1C ML's testimony, it also appeared to contradict Appellant's own concessions to investigators that he and A1C ML were yelling at each other that evening. Regardless of whether the neighbor was confused as to the night in question, or merely failed to overhear what occurred in Appellant's residence, the neighbor's testimony fails to persuade the court that the allegations are factually insufficient.

As for the lack of observable injuries, the nurse who performed the sexual assault forensic examination testified at trial. The nurse testified that it would not be unusual for there to be no visible signs of trauma. She also testified that the absence of bruising was not a reliable way to judge the extent of trauma to her body. Nevertheless, there were red marks on A1C ML's shoulders that were consistent with A1C ML's allegations that Appellant bit her on the shoulder during the attack. In addition, A1C ML's allegation that she scratched Appellant during the assault was corroborated by the discovery of Appellant's DNA under her fingernails. Furthermore, A1C ML immediately reported the incident and the forensic examination was not inconsistent with her allegations she reported.

The members heard the testimony and personally observed the witnesses, including A1C ML. Having carefully reviewed the record in this case, and having made allowances for not having personally observed the witnesses, we are satisfied that Appellant assaulted, raped, and forcibly sodomized A1C ML as alleged. We find the evidence factually sufficient.

**2. Sexual Assault Offense Involving SA AD**

Appellant next argues that the sexual assault offense involving SA AD was factually insufficient because SA AD was not so intoxicated that she was unable to consent, and that even if she was, the evidence was insufficient to demonstrate that Appellant should have known she was so intoxicated.

Although it was unclear exactly how much alcohol SA AD drank that night, she testified that, in addition to a hard cider and a mixed drink, she believes she had six to seven shots of liquor. Both she and her friends described her as very intoxicated. She had to be driven home, passed out in the back of the car on the way home, and physically assisted into her house by her friends.

Upon arriving home, SA AD's memory became unclear. She vaguely recalled texting Appellant and asking him to come to her house. Text messages

beginning around 0015 in the morning showed that SA AD initially asked Appellant to come over to her house to "snuggle." Appellant was initially reluctant to come over and suggested he come over the next morning so he would not "do this wrong." Eventually, however, Appellant agreed to come over and arrived at SA AD's house around 0051 hours.

SA AD testified that she had no memory of Appellant arriving at her house and little memory of what occurred once he was there. SA AD did recall, however, three snippets of time when Appellant was at her house that evening. First, she remembered laying her head on Appellant's shoulder on the couch. Next, she remembered being in the bedroom with Appellant and recalled seeing her legs with her pajamas sliding down. Finally, at some later point, SA AD recalled Appellant being on top of her and feeling his penis inside of her. She did not recall, at any point, being actively engaged in the sexual conduct with Appellant.

Text messages from that night suggest Appellant was in the house for no longer than 40 minutes before he left. Several hours later at approximately 0400, SA AD woke up naked on her bed without clothes. There was semen on her stomach, and she felt sore.

Later that morning, SA AD texted Appellant to bring her a contraceptive pill so she would not get pregnant. SA AD then telephoned Appellant. After Appellant first asked SA AD whether she was recording their conversation, he asked her whether she felt as though she was "sexually assaulted." Appellant later dropped off the contraceptive pill to SA AD as she had requested. The following day, SA AD texted Appellant saying that it was wrong of him to have sex with her because of how drunk she was. In response, Appellant retorted by claiming that SA AD asked him to have sex with her, and that when she later asked him to stop, he did.

The evidence demonstrated that SA AD was significantly intoxicated that evening. This was based not only on her testimony, but also that of her friends who took her home. She passed out in the back of the car on the way home and then needed to be assisted into her house. After texting Appellant, she had little recollection of anything that occurred. Her description was consistent, however, with someone who subsequently passed out from alcohol. She did not recall being actively engaged with Appellant that evening, and the surrounding evidence and testimony suggested she was not. Appellant's later conversations about that evening with SA AD corroborate that Appellant did have sex with her.

Even more troubling, because it showed consciousness of guilt, were his questions to SA AD about whether she was recording the conversation and whether she felt she had been sexually assaulted. Appellant had known and dated SA AD for approximately a year, so he was aware of how she behaved

while severely intoxicated. Under such circumstances, and based upon our independent review of the record, we conclude beyond a reasonable doubt that Appellant engaged in a sexual act with SA AD and that he knew or reasonably should have known she was incapable of consenting to the act due to her impairment. The evidence is factually sufficient for this offense.

### 3. Stalking Offense Involving SA AD

Finally, Appellant argues there is insufficient evidence to show that SA AD was placed in fear of bodily harm by him calling her, yelling at her, following her during off-duty hours, and placing a weapons target at her residence. Appellant's primary argument is that SA AD was offered a no-contact order but she refused it.

The course of conduct that constituted the stalking offense occurred between February 2013 and October 2013. It culminated several weeks after the sexual assault with her discovering a weapon sighting target at her residence. Before the summer of 2013, SA AD vocalized her fears to Appellant after he came to her house and was yelling at her about a disagreement over their relationship. She told him that he made her feel unsafe in her own home. During the course of their relationship, Appellant was frequently possessive, controlling, and confrontational with SA AD. After their relationship ended and after he sexually assaulted her, the evidence supports that Appellant left the target on her front steps. Ultimately, she and her roommate were so scared that they terminated their lease early and moved to a location where Appellant would be unable to find her.

We have carefully reviewed the evidence adduced at trial. We are not persuaded by Appellant's argument that SA AD's refusal of a no-contact order demonstrates a lack of fear. She explained that the reason for her refusal was her desire, at the time of the offer, to keep her name out of the investigation. Shortly thereafter, a no-contact order would have had little effect as Appellant was placed in pretrial confinement. The record supports that although SA AD was conflicted about whether to pursue allegations against Appellant, Appellant's actions toward her did place her in fear of bodily harm.

We believe the evidence supports that Appellant's course of conduct toward SA AD was intended to cause SA AD emotional distress by placing her in fear of physical harm, and that it did, in fact, cause her emotional distress. Having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt.

### B. Constitutional Challenge to Article 120(b)(3), UCMJ

Appellant asserts his conviction of sexual assault for engaging in a sexual act with SA AD while she was "incapable of consenting to the sexual act because she was impaired by an intoxicant" should be set aside because the of-

*United States v. Condon*, No. ACM 38765

fense as charged is unconstitutionally vague. Specifically, Appellant asserts that the terms "impairment," "incapable," and "competent" are not defined by the statute and, therefore, what constitutes conduct prohibited by this offense is ambiguous.

We review the constitutionality of a statute de novo. *United States v. Disney*, 62 M.J. 46, 48 (C.A.A.F. 2005). The Due Process Clause of the Fifth Amendment[8] "requires 'fair notice' that an act is forbidden and subject to criminal sanction" before a person can be prosecuted for committing that act. *United States v. Vaughan*, 58 M.J. 29, 31 (C.A.A.F. 2003) (quoting *United States v. Bivins*, 49 M.J. 328, 330 (C.A.A.F. 1998)). Due process "also requires fair notice as to the standard applicable to the forbidden conduct." *Id.* (citing *Parker v. Levy*, 417 U.S. 733, 755 (1974)). In other words, "[v]oid for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed." *Parker*, 417 U.S. at 757 (citing *United States v. Harriss*, 347 U.S. 612, 617 (1954)). A void for vagueness challenge requires inquiry into whether a reasonable person in Appellant's position would have known that the conduct at issue was criminal. *See, e.g.*, *Vaughan*, 58 M.J. at 31 (upholding a conviction under Article 134 for leaving a 47-day-old child alone on divers occasions for as long as six hours; while Article 134 did not specifically list child neglect as an offense, the appellant "should have reasonably contemplated that her conduct was subject to criminal sanction, and not simply the moral condemnation that accompanies bad parenting"); *United States v. Sullivan*, 42 M.J. 360, 366 (C.A.A.F. 1995) ("In our view, any reasonable officer would know that asking strangers of the opposite sex intimate questions about their sexual activities, using a false name and a bogus publishing company as a cover, is service-discrediting conduct under Article 134.").

In addition, due process requires that criminal statutes be defined "in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). This "more important aspect of the vagueness doctrine" requires that the statute "'establish minimal guidelines to govern law enforcement'" rather than "'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'" *Id.* at 358 (quoting *Smith v. Goguen*, 415 U.S. 566, 574–75 (1974)) (alteration in original).

The challenged provision of Article 120(b)(3)(A), UCMJ, makes it a crime to "commit[ ] a sexual act upon another person when the other person is inca-

---

[8] U.S. CONST. amend. V.

10

pable of consenting to the sexual act due to impairment by any drug, intoxicant, or other similar substance, and that condition is known or reasonably should be known by the person."

A "sexual act" is defined, in relevant part, as "the penetration, however slight, of the vulva or anus or mouth of another by any part of the body or by any object, with an intent to abuse, humiliate, harass, or degrade any person or to arouse or gratify the sexual desire of any person." Article 120(g)(1)(B), UCMJ. With regard to consent, the statute provides, "A sleeping, unconscious, or incompetent person cannot consent." Article 120(g)(8)(B), UCMJ, 10 U.S.C. § 920(g)(8)(B).

As the Supreme Court has observed, we do not evaluate the statute in the abstract. "In determining the sufficiency of the notice a statute must of necessity be examined in the light of the conduct with which a defendant is charged." *Parker*, 417 U.S. at 757 (quoting *United States v. National Dairy Corp.*, 372 U.S. 29, 33 (1963)).

Here, Appellant was charged with engaging in a sexual act with a woman who was so intoxicated that (1) she had to be assisted out of the bar and into her home by her friends; (2) she was completely unaware of Appellant leaving her house less than an hour after his arrival; (3) she was left naked, on top of her covers, with semen on her stomach, and remained in this condition for several hours until she woke up; and (4) Appellant injected the potential that she was sexually assaulted by him when he asked SA AD whether she felt as though he sexually assaulted her. *See also United States v. Ginn*, No. ACM 38551, 2015 CCA LEXIS 334 (A.F. Ct. Crim. App. 17 Aug. 2015) (holding that the same portion of Article 120 involved in the case at bar was not void for vagueness where the appellant engaged in a sexual act with a woman who was so intoxicated that she could not walk unaided from the bathroom to the bed in an adjoining room). Even if there is some ambiguity as to the degree of impairment necessary to render a person incapable of consenting, "a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." *Id.* at *27 (quoting *Parker*, 417 U.S. at 759).

We find Appellant's arguments that Article 120(b)(3), UCMJ, is void for vagueness unconvincing. Appellant was on reasonable notice that his conduct was subject to criminal sanction.

## C. Denial of Challenge for Cause—Implied Bias

Appellant alleges the military judge erred in denying the Defense challenge for cause concerning a panel member, Maj AF. Appellant contends Maj AF should have been excused under the implied bias standard. The Defense's

sole basis for the implied bias challenge against Maj AF at trial was "burden of proof issues."[9]

Rule for Courts-Martial (R.C.M.) 912(f)(1)(N) provides that a member shall be excused for cause whenever it appears that the member "[s]hould not sit as a member in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality."

Implied bias is "viewed through the eyes of the public, focusing on the appearance of fairness." *United States v. Bagstad*, 68 M.J. 460, 462 (C.A.A.F. 2010) (quoting *United States v. Clay*, 64 M.J. 274, 276 (C.A.A.F. 2007)). Therefore, appellate courts employ an objective standard when reviewing a military judge's decision regarding implied bias. *United States v. Strand*, 59 M.J. 455, 458 (C.A.A.F. 2004). "The hypothetical 'public' is assumed to be familiar with the military justice system." *Bagstad*, 68 M.J. at 462 (citing *United States v. Downing*, 56 M.J. 419, 423 (C.A.A.F. 2002)). We review issues of implied bias under a standard less deferential than abuse of discretion but more deferential than de novo. *Id.* (citing *United States v. Moreno*, 63 M.J. 129, 134 (C.A.A.F. 2006)).

In reviewing challenges for cause under the implied bias standard, military judges are required to follow the "liberal grant" mandate, which "supports the UCMJ's interest in ensuring that members of the military have their guilt or innocence determined 'by a jury composed of individuals with a fair and open mind.'" *United States v. James*, 61 M.J. 132, 139 (C.A.A.F. 2005) (quoting *United States v. Smart*, 21 M.J. 15, 18 (C.M.A. 1985)). "[M]ilitary judges must follow the liberal-grant mandate in ruling on challenges for cause, but we will not overturn the military judge's determination not to grant a challenge except for a clear abuse of discretion in applying the liberal-grant mandate." *United States v. White*, 36 M.J. 284, 287 (C.M.A. 1993). "[I]n the absence of actual bias, where a military judge considers a challenge based upon implied bias, recognizes his duty to liberally grant de-

---

[9] On appeal, Appellant appears to invite this court to expand the basis for the challenge to include the member's initial responses to questions about whether the Air Force was doing enough to combat sexual assault and whether a conviction must include confinement or a punitive discharge. This additional basis has been forfeited absent plain error as it was not asserted at trial. *See United States v. Bannwarth*, 36 M.J. 265, 268 (C.M.A. 1993); Rule for Courts-Martial (R.C.M.) 912(f)(4). Having reviewed the member's responses and explanations in their entirety, we conclude that the military judge's failure to grant a challenge for cause on this unraised rationale was not plain error.

fense challenges, and places his reasoning on the record, instances in which the military judge's exercise of discretion will be reversed will indeed be rare." *Clay*, 64 M.J. at 277.

We are not persuaded that the military judge should have excused Maj AF under an implied bias challenge.

In group voir dire, all members said that they understood that the Defense had no obligation to present evidence and no member disagreed with that rule of law. The military judge then asked whether, despite this rule of law, any of the members thought the Defense should put on witnesses and evidence. Maj AF and one other member responded affirmatively. Counsel and the court conducted individual voir dire with Maj AF and elicited more detailed explanations as to these concepts.

> MJ: So, there was some discussion about—you heard my instructions that an accused has an absolute right to remain silent and the defense has no burden whatsoever, they don't have to do anything in a criminal trial, any trial. Do you understand that?
>
> Maj AF: Yes, sir.
>
> MJ: And I think there was some discussion about . . . they should do something and you indicated, yes. Can you kind of help walk me through that?
>
> Maj AF: Well, I guess, I understand that, but it's still the thought process to be able to stay quiet and not be able to explain their perspective is really, I guess, what I was trying to cope with the yes or no answer.
>
> MJ: That makes sense. We're allowed to have human reactions. So, it's very natural to think if I was involved in a situation in a courtroom or I was there, I might feel like I need to say something or put on evidence. Is that fair?
>
> Maj AF: Yes, sir.
>
> MJ: Understanding that completely, are you comfortable that you will not draw any adverse inference, whatsoever, if they choose not to do anything?
>
> Maj AF: Yes, sir.
>
> MJ: And I'm not saying they're going to do that or not do that. I don't know. We'll find out together. I just want to get a feel from you if you can follow my instructions and set that aside if that is their option?

Maj AF: I can. Yes, sir.

After voir dire, the Defense challenged Maj AF for cause based on actual and implied bias.[10] Trial defense counsel argued that although Maj AF eventually stated that he would follow the military judge's instructions, his vacillating answers on what he expected from the Defense would cause a member of the public to have concerns regarding the burden of proof.

The military judge denied the challenge and provided a detailed explanation of his rationale.

> With regard to [Maj AF], the challenge is denied. I don't have any concerns of [Maj AF] sitting as a member in this case. Having watched him answer the questions, he did not struggle with the burden of proof. He struggled with a series of questions where we test somebody's common sense and we talked about this on the record before the members came in and that is, "Do you expect us to put on a case?" And he reacted like many people did. I'd like to see something. That's a pretty honest answer. The real question is when you follow up with him and ask him, "Do you understand if somebody stays quiet? That's okay." He did. He not only understood it, he went on to say without me asking questions, and this was towards the end of a defense counsel question. He said, "Silence is as the same as anything." The defense asked, "What do you expect to see from us?" And he said, "Well, silence is the same as anything. I am not expecting to see anything." And I did not have to step in to give him instructions on it. I did not have to step in to correct him. I did not step in to ask questions. He did that on his own through questions by the defense counsel, which tells me he was thinking through the concepts which are complicated, we put them in here and have them ask that, he understood beyond a reasonable doubt; he actually remembered part of the instruction, maybe the other members did [too], but he actually repeated it, which tells me he was listening; he's open to a consideration of the range of what can happen; he has no preconceived notions based on that paper, in reference to the charge sheet, pretty clearly. So, he seemed to me to be exactly what we want as a court member when it comes to the burden of proof and when it

---

[10] Appellant specifically does not raise the denial of the actual bias challenge on appeal. We have reviewed the record and agree that the military judge did not err in denying an actual bias challenge against Major AF.

> comes to the punishment, open to the range. . . . He's got no actual bias. He didn't demonstrate implied bias and I've certainly considered the liberal grant mandate. When comparing him to the other members, though, he seems exactly like he falls within what we want from the rules for court-martial and what the convening authorities are supposed to consider.

The crux of Appellant's argument on appeal is two-fold. First, the military judge's reasoning was relevant only to actual bias rather than implied bias. Second, the military judge did not fully consider and apply the liberal grant mandate when denying the challenge for cause.

Though we acknowledge that much of the military judge's analysis was focused on whether Maj AF was actually biased, the military judge's rationale also impacted how the public would view the fairness of the proceeding if he sat on the court-martial. How Maj AF responded to the questions put forth by counsel and the military judge necessarily impacted whether the public would question the member's ability and willingness to follow the instructions of the military judge. Here, Maj AF demonstrated that he was extremely focused on the instructions provided by the military judge as he recited the instructions back when answering questions. Furthermore, he was thorough in explaining his thought process regarding his responses to the questions posed by the military judge and counsel.

In addition, we are also convinced that the military judge applied the liberal grant mandate. The military judge, through the entire voir dire process, frequently referenced the liberal grant mandate in granting and denying challenges for cause. The military judge specifically cited the liberal grant mandate as the justification for granting three other Defense challenges for cause. From our review of the record in its entirety, we conclude that the military judge's recitation of the liberal grant mandate was not merely a perfunctory or talismanic reference and is worthy of some deference.

Considering Maj AF's responses through the eyes of the public and focusing on the appearance of fairness in the military justice system, we find that the military judge did not err. He considered the challenge based upon implied bias, recognized his duty to liberally grant defense challenges, and placed his rationale on the record. Under the "'totality of the circumstances,'" we find no reason to disturb his ruling. *United States v. Terry*, 64 M.J. 295, 302 (C.A.A.F. 2007) (quoting *Strand*, 59 M.J. at 456).

**D. Ineffective Assistance of Counsel**

Pursuant to *Grostefon*, 12 M.J. 431, Appellant asserts that either the military judge erred or, alternatively, his counsel were ineffective by not ques-

tioning SA AD in findings about a purported prior statement she made regarding her desire to have sex with Appellant on the night of the offense.

Appellant also alleges his trial defense counsel were ineffective during sentencing for failing to respond to testimony from the Government's expert and failing to obtain a psychosexual examination of Appellant. Appellant alleges that his counsel did not discuss the possibility of such an examination with him and that, if he was aware of such an examination, his family would have paid for it if necessary. Appellant asserts that, given the widespread use of these examinations in civilian sentencing hearings, this court should conclude that his counsel's failure to pursue such a test is per se ineffective.

We ordered the submission of affidavits from trial defense counsel. Appellant submitted an additional affidavit in reply. Having reviewed the affidavits of Appellant and his counsel, we conclude we need not order additional fact-finding to resolve the assigned error. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997).

We review claims of ineffective assistance of counsel de novo, applying the two-part test outlined by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *United States v. Tippit*, 65 M.J. 69, 76 (C.A.A.F. 2007). Under that test, "[i]n order to prevail on a claim of ineffective assistance of counsel, an appellant must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice." *United States v. Green*, 68 M.J. 360, 361 (C.A.A.F. 2010).

The deficiency prong requires Appellant to show his counsel's performance fell below an objective standard of reasonableness, according to the prevailing standards of the profession. *Strickland*, 466 U.S. at 688. To determine whether the presumption of competence has been overcome as alleged by an appellant, we examine whether there is a reasonable explanation for counsel's actions and whether defense counsel's level of advocacy fell measurably below the performance ordinarily expected of fallible lawyers. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011).

The prejudice prong requires Appellant to show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In doing so, Appellant "must surmount a very high hurdle." *United States v. Moulton*, 47 M.J. 227, 229 (C.A.A.F. 1997) (citing *Strickland*, 466 U.S. at 689). This is because counsel is presumed competent in the performance of his or her representational duties. *United States v. Anderson*, 55 M.J. 198, 201 (C.A.A.F. 2001). Thus, judicial scrutiny of a defense counsel's performance must be "highly deferential and should not be colored by the distorting effects of hindsight." *United States v. Alves*, 53 M.J. 286, 289 (C.A.A.F. 2000) (citing *Moulton*, 47 M.J. at 229).

In *United States v. Polk*, our superior court interpreted *Strickland* and identified three basic questions to determine if the presumption of defense counsel's competence is overcome:

> (1) Are the appellant's allegations true; if so, is there a reasonable explanation for counsel's action in the case?

> (2) If the allegations are true, did the level of advocacy fall measurably below the performance ordinarily expected of fallible lawyers?

> (3) If counsel was ineffective, is there a reasonable probability that, absent errors, the outcome would be different?

32 M.J. 150, 153 (C.M.A. 1991). When challenging the performance of counsel, an appellant bears the burden of establishing the truth of the factual allegations that would provide the basis for finding deficient performance. *Tippit*, 65 M.J. at 76 (citing *Polk*, 32 M.J. at 153).

### 1. Ineffective Assistance of Counsel During Findings

Our analysis of Appellant's complaint in findings starts with a review of the Defense's cross-examination of SA AD. The Defense asked about SA AD's desires toward Appellant on the night of the alleged sexual assault:

> [Defense Counsel (DC)]: [W]hen you were at The Red Door did you ever pull the accused aside and tell him you wanted to have sex that night?

> SA AD: I did not.

> DC: Did—internally, did you want to have sex with [Appellant] that night?

> SA AD: No. I wanted to, you know, I wanted to cuddle and be sweet. But I didn't want to, like, have a one night stand or anything like that.

Later in the trial, the Defense called a friend of Appellant who recalled seeing the Appellant and SA AD at The Red Door sometime in late August. Though the testimony was inconclusive as to whether he was referring to the night of the assault, his testimony suggested he was. The witness recalled Appellant introducing SA AD as his girlfriend. The Defense then requested a hearing outside of the members.

In a closed hearing, Appellant's friend testified that he overheard SA AD tell Appellant that she wanted to take him home, that he interpreted the statement as referring to sex, and that Appellant smirked in response. In addition, Appellant's friend also testified that at another point that evening while Appellant was in the bathroom, SA AD told him that she wanted to

take Appellant home that evening to have sex. The Defense, however, told the military judge that they did not intend to elicit SA AD's purported second statement and instead only intended to elicit SA AD's statement to Appellant. The military judge clarified with the Defense that this was their intent. The military judge did not specifically make a ruling on the admissibility of this additional statement by SA AD, but permitted Appellant's friend to testify that he overheard her tell Appellant that she was "excited to be able to take her sexy man home that evening" and that Appellant smirked in response.

It is accurate that trial defense counsel did not attempt to impeach SA AD by cross-examination with these alleged prior inconsistent statements. These statements, however, would have had very little probative value in the context of this case. As such, there are four reasons Appellant cannot demonstrate there was no reasonable explanation for his counsel's actions, that his counsels' strategic decision fell measurably below the performance expected of fallible lawyers, or that there is a reasonable probability that absent that decision, the outcome of the trial would have been different.

First, rather than providing SA AD the first opportunity to deny or attempt to explain the purported statement overheard by Appellant's friend, their strategy was to instead confirm the statement with SA AD and then present the purported inconsistent statement with their own witness. This is a sound strategy and did not fall below the level of advocacy ordinarily expected.

Second, as to the statement purportedly made to Appellant's friend, Appellant is not able to show how the introduction of a prior inconsistent statement that was substantially similar to the witness's admitted testimony would have tipped the balance in his favor. The Defense was able to establish that SA AD was interested in being alone with Appellant the evening of the sexual assault. They accomplished this not only through the testimony of Appellant's friend about the conversation he overheard, but also through SA AD's text messages later that evening when she invited Appellant over to her house "just to snuggle."

Third, as to the additional statement, there were aspects of that testimony that would have unnecessarily raised additional credibility concerns. Whereas overhearing a private conversation where SA AD insinuated to her ex-boyfriend a desire to have sex may be believable, especially in light of SA AD's later text messages, the additional statement would have raised other concerns such as the likelihood that SA AD would tell a stranger that she wanted to have sex with Appellant that evening.

Finally, the relevance of this testimony was diminished because of the offense charged and the Government's theory of criminality. Appellant was al-

leged to have committed a sexual act upon SA AD while she was incapable of consenting due to the impairment of an intoxicant. This theory focused on how intoxicated SA AD was at the end of evening and later at her house. It was not that SA AD actively refused to have sex with Appellant or told Appellant "no." The Government's focus was on her inability to consent because of her significant degree of intoxication. Consequently, the additional unoffered statement from Appellant's friend provided little added benefit that was not already before the members.

For these reasons, we find that Appellant has failed to establish that he was denied effective assistance of counsel.

**2. Ineffective Assistance of Counsel During Sentencing**

Dr. DE, the prosecution's forensic psychologist testified about recidivism in sentencing. He explained that deviant sexual behaviors—behaviors that are illegal or outside the norm—are a primary indicator for recidivism. According to Dr. DE, antisocial personality traits, such as using other people for one's own advantage, lacking empathy, or appearing glib and superficial, were also indicators for recidivism.

On cross-examination, Dr. DE acknowledged he had never treated or spoken to Appellant. Trial defense counsel also elicited facts present in this case that weighed against recidivism, to include that Appellant was over 25 years of age, that he had been in a relationship lasting over two years, and that none of his victims were strangers, family members, children, or male.

In response to an order compelling affidavits, the three trial defense counsel who represented Appellant at trial provided a joint declaration to this court. The declaration contained, as an attachment, a second declaration from the Defense expert in forensic psychology, Dr. KG.

As one would expect of competent defense counsel, trial defense counsel in this case retained a well-qualified expert in forensic psychology, Dr. KG, and relied upon their expert as they prepared for trial. Dr. KG had served as a mitigation expert on death penalty cases, had extensive experience in the area of risk/recidivism management with criminal offenders, including sex offenders, and had provided forensic psychological services in over 7,000 legal cases. Trial defense counsel specifically considered whether to have a psychological evaluation conducted on Appellant, but after consultation with Dr. KG, made a strategic decision not to do so. Dr. KG was very familiar with the risk factors for sex offender recidivism, and, in her professional opinion, "testimony regarding risk factors and recidivism in [Appellant's] case would prove more harmful than helpful." Furthermore, Dr. KG advised counsel that she was aware of the criteria used to score the test, and, knowing the facts of Appellant's case, did not believe that "formalizing the scores" would provide

any additional information helpful to the Defense. This advice was consistent with a prior expert retained by the Defense as well. Based upon this advice, the Defense team reasonably concluded that a psychosexual examination was not likely to be a productive venue and that they could better represent their client through other pre-trial preparations.

This is not a situation where trial defense counsel neglected to consider all possibilities for Appellant's sentencing case or were ill-prepared to vigorously represent their client. They relied on their expert and made a reasoned strategic decision. Even if this strategic decision had ended up being the wrong choice, trial defense counsel's well-thought-out, well-informed, and objectively reasonable decision did not fall measurably below the level of advocacy expected from fallible lawyers. In reviewing the decisions and actions of trial defense counsel, we will not second guess reasonable strategic or tactical decisions. *See United States v. Morgan*, 37 M.J. 407, 410 (C.M.A. 1993).

Furthermore, Appellant has not met his burden of showing that there is a reasonable probability that, but for the failure to obtain a psychosexual examination, the outcome of the trial would have been different. Utilizing the advice of their expert, the defense counsel conducted a thorough cross examination of the Government's expert and effectively highlighted certain factors in Appellant's case that the Government's expert conceded weighed against Appellant reoffending. There is no reasonable probability that the outcome at sentencing would have been different if Appellant had undergone a psychosexual exam and the results had been presented to the members.

Under these facts, trial defense counsel made a tactical decision not to conduct a psychosexual examination of Appellant. Furthermore, based upon their effective cross-examination of the Government expert, Appellant was unable to demonstrate prejudice. As such, we decline to grant relief.

**E. Findings Instructions**

Appellant next asserts the military judge should have provided the Defense's proposed instruction, or a suitable replacement, regarding what constitutes inability to consent as it pertained to the alleged sexual assault against SA AD. The Defense specifically requested the military judge to instruct the members that "a person is capable of consenting to a sexual act of sexual intercourse unless she is incapable of: (1) understanding the act; (2) it's [sic] motive; (3) *and* its possible consequences." (emphasis added). Appellant argues the proposed instruction was necessary to clarify for the members that a person can be impaired and yet have the capacity to consent to sexual intercourse.

It is the military judge's duty to properly instruct the members at trial. *United States v. Quintanilla*, 56 M.J. 37, 83 (C.A.A.F. 2001). A military

judge's decision to provide an instruction is reviewed for an abuse of discretion. *United States v. Maxwell*, 45 M.J. 406, 424 (C.A.A.F. 1996). However, the propriety of the instructions given by the military judge is reviewed de novo. *Id.* In examining instructions provided by the military judge, an appellate court examines "whether the instruction[s] as a whole provide[ ] meaningful legal principles for the court-martial's consideration." *United States v. Truman*, 42 C.M.R. 106, 109 (C.M.A. 1970); *see also Jones v. United States*, 527 U.S. 373, 391 (1999) (stating that each instruction must be evaluated in the "context of the entire charge"). "The military judge has considerable discretion in tailoring instructions to the evidence and law." *United States v. Hopkins*, 56 M.J. 393, 395 (C.A.A.F. 2002).

When counsel request specific instructions, the military judge has substantial discretion in deciding on the instructions to give and whether the instruction is appropriate. *United States v. Miller*, 58 M.J. 266, 270 (C.A.A.F. 2003). This discretion must be exercised in light of correct principles of law as applied to the facts and circumstances of the case. *Id.* For the military judge's refusal to instruct the members as requested to be in error, the requested instruction must be correct, it must not be substantially covered elsewhere in the instructions, and must be "on such a vital point in the case that the failure to give it deprived [the] defendant of a defense or seriously impaired its effective presentation." *Id.* (alteration in original).

Prior to individual voir dire and the presentation of evidence, the military judge cautioned the members regarding the interplay of intoxication as it related to an ability to consent:

> If you've been to a SAPR down day, likely this is an area where there may be, not necessarily is, but there may be some discrepancy between what the law is and then what people teach in relation to consent as it relates to alcohol. I say that only because I too am required to attend SAPR training, so I had the opportunity to see some of it recently. And it's possible that you've heard that alcohol as little as a drink or some number more than that lead to a lack of consent. And so, when you ultimately start to deliberate, the instruction I talk about is one of the elements—I'm not going to go through all of them—but it is that the individual in the allegation, the alleged victim, was incapable of consenting to these sexual acts due to impairment by drug, intoxicant, or similar substance. And that condition was known, or reasonably should have been known, by the person charged with the offense.

> So, the law does define consent. "Consent" means a freely given agreement to the conduct at issue by a competent person.

An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance or submission, resulting from the use of force, threat of force, or placing another person in fear does not make consent. A current or previous dating or social or sexual relationship by itself shall not constitute consent. A sleeping, unconscious, or incompetent person cannot consent to a sexual act. The government has the burden to prove beyond a reasonable doubt that consent did not exist. And then likely I would give you some factors to consider. The important thing is alcohol, of course, can be a factor in play in a lack of consent. However, . . . a single drink likely does not obviate consent. I mean, a lack of consent is where a person is not capable of understanding their actions and doesn't understand what they're consenting to. That can differ of course from person to person and situation to situation. So, I want you to understand that.

In the military judge's findings instructions regarding the alleged sexual assault against SA AD—instructions that he provided to the members both orally and in writing—he again advised the members that one of the elements that the Government must prove beyond a reasonable doubt was that SA AD was incapable of consenting to the sexual act due to impairment by an intoxicant.

As to consent, the military judge's findings instructions defined the term just as he had done previously during voir dire.[11] Unlike voir dire, however, the military judge did not further instruct the members on what constituted lack of consent or an inability to consent. The military judge also defined "impaired" as "any intoxication sufficient to impair the rational and full exercise of the mental or physical faculties."

We first address whether the Defense's proposed instruction regarding "capability to consent" was a correct statement of the law. We conclude that the requested instruction was not. Our superior court recently adopted a definition of "incapable of consenting" that requires the alleged victim to lack the cognitive ability to appreciate the sexual conduct in question *or* lack the physical or mental ability to make or communicate a decision about whether he or she agreed to the conduct. *United States v. Pease*, 75 M.J. 180, 185–86 (C.A.A.F. 2016). This definition differs from that requested by the Defense in

---

[11] The military judge provided the definition of consent earlier in his finding instructions and then informed the members that it was unnecessary for him to re-read all of the same definitions when they reoccurred later in the findings instructions.

this case. The Defense's requested definition failed to address an inability to consent where the alleged victim lacks the physical or mental ability to do so. Instead, the Defense's proposed definition focused solely on the alleged victim's understanding and appreciation of the event. In addition, the Defense's requested instruction added additional requirements that the alleged victim also not understand Appellant's motive or the consequences of the act. As the Defense's proposed instruction is incomplete and potentially misleading, it was not error for the military judge to decline to provide the Defense's requested instruction.

We next address whether the military judge's instructions provided to the members were correct and sufficient under the facts of this case. We conclude they were and that it was not "vital" for the military judge to instruct the members further on what constituted an inability to consent.

Under the facts of this case, the definition of consent as a freely given agreement was sufficient based on the ordinary understandings of the words used to define consent. In addition, the definition of "impairment" was consistent with the normal sense of the word in common usage. The military judge's instructions ensured that the members were adequately advised that "impairment" was not meant to stand on its own, but to be read in conjunction with the term "incapable of consenting." In other words, impairment alone was not sufficient to show inability to consent. The impairment would have to be to a certain level such that the alleged victim was unable to enter into a freely given agreement.

While we acknowledge that the military judge could have provided additional instructions, such as those subsequently set out in *Pease,* it was not an abuse of discretion for the military judge to refrain from doing so under the facts of this case. Unless the military judge expected or feared that the members might become confused by the terms considering the facts of the case before them, there was little reason to provide more detailed instructions on what constituted "capability to consent." *Cf. United States v. Long*, 73 M.J. 541, 545–46 (Army Ct. Crim. App. 2014) (in response to a member question that raised inability to consent as a subject of potential confusion, the trial judge did provide an additional instruction regarding whether someone who is intoxicated or has been drinking is competent to give consent). There was nothing in the military judge's instructions, nor in argument of trial counsel, that incorrectly suggested or inferred that only a minimal amount of impairment was necessary for the Government to prove that SA AD was incapable of consenting. There was no evidence or suggestion that the members misunderstood the instructions as provided. Instead, it was clear throughout the trial that the amount of impairment must be substantial before it rises to a level that could result in an inability to consent.

At the beginning of trial, in voir dire, the military judge specifically instructed the members that a single alcoholic drink would likely not obviate consent and that lack of consent is "where a person is not capable of understanding their actions and doesn't understand what they're consenting to." Though not included in the findings instruction portion of the trial, the military judge's explanation was consistent with the findings instructions he provided, as well as the Government's theory of culpability.

The Government, rather than erroneously suggesting that any level of intoxication equates to an inability to consent, focused instead on the extreme level of impairment of SA AD that evening, to include that her blood-alcohol level may have been as high as .34, she needed assistance from her friends to get into the house, she passed out from alcohol before Appellant arrived, Appellant likely had to carry her up the stairs because of her intoxication, she had significant memory loss as a result of her intoxication, and Appellant's actions and statements afterward suggested that he understood that she was too intoxicated to consent when he engaged in sex with her.

We believe the military judge's instructions were substantively complete and correct. *See United States v. Wolford*, 62 M.J. 418, 419 (C.A.A.F. 2006). We conclude that the military judge did not abuse his discretion in refusing to provide the Defense's instruction for "incapability to consent," and did not abuse his discretion by failing to provide a substitute instruction for this concept.

**F. Findings Argument**

For the first time on appeal, Appellant identifies several comments made by the trial counsel during the closing argument and asserts that the argument was improper. The errors include allegations that trial counsel's findings argument included facts not in evidence, personal attacks on the Defense, impermissible argument that invoked the Air Force's training on sexual assault prevention, and erroneously called upon the members to do "justice" with their verdict.

As Appellant failed to object to these matters at trial, we review for plain error, only granting relief if he carries his burden of demonstrating: "(1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right." *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005). Improper argument is a question of law that we review de novo. *United States v. Sewell*, No. 16-0360/AR, 2017 CAAF LEXIS 59, at *10 (C.A.A.F. 1 Feb. 2017). When determining whether prosecutorial comment was improper, the statement "must be examined in light of its context within the entire court-martial." *United States v. Carter*, 61 M.J. 30, 33 (C.A.A.F. 2005).

Counsel are to limit arguments to evidence in the record and reasonable inferences that can be drawn from that evidence. *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000). While a trial counsel "may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Fletcher*, 62 M.J. at 179 (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). "[I]t is error for trial counsel to make arguments that 'unduly . . . inflame the passions or prejudices of the court members.'" *United States v. Schroder*, 65 M.J. 49, 58 (C.A.A.F. 2007) (quoting *United States v. Clifton*, 15 M.J. 26, 30 (C.M.A. 1983)). Trial counsel are also prohibited from injecting into argument irrelevant matters, such as facts not in evidence or personal opinions about the truth or falsity of testimony or evidence. *Schroder*, 65 M.J. at 58; *Fletcher*, 62 M.J. at 179; R.C.M. 919(b), Discussion. To that end, courts have struggled to draw the "exceedingly fine line which distinguishes permissible advocacy from impermissible excess." *Fletcher*, 62 M.J. at 183 (quoting *United States v. White*, 486 F.2d 204, 207 (2d Cir. 1973)).

In evaluating counsel's argument, our decision need not depend on whether any of trial counsel's arguments were, in fact, improper if we conclude Appellant has not met his burden of establishing the prejudice prong of the plain error analysis. *United States v. Erickson*, 65 M.J. 221, 224 (C.A.A.F. 2007). The "best approach" to the prejudice determination involves balancing three factors: "(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction." *Fletcher*, 62 M.J. at 184. We also recognize that the lack of defense objection is some measure of the minimal prejudicial impact of the trial counsel's argument. *United States v. Gilley*, 56 M.J. 113, 123 (C.A.A.F. 2001). In sum, "reversal is warranted only 'when the trial counsel's comments, taken as a whole, were so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone.'" *Sewell*, 2017 CAAF LEXIS 59, at *11 (quoting *United States v. Hornback*, 73 M.J. 155, 160 (C.A.A.F. 2014)).

We first address the portions of trial counsel's argument that Appellant now asserts constituted facts not in evidence. Appellant alleges trial counsel improperly asserted that over 20 agents conducted over 100 interviews as part of the investigation of Appellant's misconduct. The Defense, however, specifically elicited this information when cross-examining another special agent, SA CS. Moreover, considering the argument in its totality, we reject Appellant's assertion that the cursory reference constituted improper "bolstering."

Appellant also asserts trial counsel was incorrect when arguing that their expert's most conservative estimate of SA AD's blood alcohol level was .22.

Though Appellant may disagree with SA AD's blood alcohol level or the meaning of the expert's testimony in the context of this case, it was a reasonable inference derived from the expert's testimony. These portions of trial counsel's argument are not error, plain or otherwise.

Appellant next asserts trial counsel's description of the Defense's argument as "smoke and mirrors" constituted a personal attack on trial defense counsel. Specifically, trial counsel argued that, "Members, when a unit is in retreat they pop smoke to hide their movements to obstruct and distract. . . . Smoke bombs, mirrors, and distractions." Despite Appellant's assertions to the contrary, counsel's arguments, when taken in the proper context, were not personally attacking opposing counsel or their integrity. Trial counsel did not accuse trial defense counsel of fabricating a defense or omitting favorable evidence. *Cf. Fletcher*, 62 M.J. at 182. Instead, trial counsel was, in a cursory manner, attempting to highlight the weaknesses in the Defense's arguments, contending that some of the arguments being advanced were not truly relevant to the issues at hand. After reviewing the entirety of trial counsel's argument, we find that the "smoke and mirrors" comment was fleeting and did not prejudice Appellant. *See United States v. Burgh*, No. ACM 38207, 2014 CCA LEXIS 824, at *15–16 (A.F. Ct. Crim. App. 16 Apr. 2014) (unpub. op.) (finding no prejudice for trial counsel's "smoke bombs" argument given the limited nature of the comments). Under the facts and circumstances of this case, trial counsel's argument was not plain error and, assuming it did constitute a personal attack, Appellant was not prejudiced by this argument.

Appellant also argues trial counsel improperly referred to an expert's testimony regarding false allegations. The sole reference to the expert's testimony was as follows:

> And the testimony of [the expert] and we were talking about this concept, that has been researched, of false allegations and what you see there? What do you look for? Well, the primary motive is alibi. Overwhelmingly, the number one is alibi. You need a reason for something that has happened to you; an unexplained pregnancy, an unexplained sexually-transmitted disease. We don't have any of that here. So, the next one would be revenge, but if revenge was her goal, she was going about it the wrong way with a restricted report.

Trial counsel then moved on to discussing Appellant's statement to investigators and how Appellant's story changed during the course of the interview. As with every other allegation regarding the findings argument raised on appeal, Appellant did not object to this argument at trial.

This was proper argument and did not constitute impermissible "human lie detector" testimony. Impermissible "human lie detector" testimony is "an

opinion as to whether the person was truthful in making a specific statement regarding a fact at issue in the case." *United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014) (quoting *United States v. Brooks*, 64 M.J. 325, 328 (C.A.A.F. 2007)). In his testimony, the expert did not state an opinion as to whether any victim was telling the truth, and trial counsel did not argue the expert made such an assertion. Instead, in the context of the entire argument, trial counsel was noting reasons that false allegations were less likely in this case because many of the warning signs were not present here. As the Defense had attacked the victims' credibility on cross-examination and implied that they fabricated the allegations, this was a permissible tactic to rebut that argument. Thus, this argument was not error, plain or otherwise.

Appellant also argues trial counsel improperly informed the members that they should exact "justice" by finding Appellant guilty—a finding that would also assist the victim with the self-blame she was experiencing. We agree that referencing the jury's societal obligation is inappropriate if it suggests the panel base its decision on the impact of the verdict on society, a victim, and the criminal justice system as a whole, rather than the facts of the case. We do not, however, conclude trial counsel's argument suggested this improper purpose. Trial counsel repeatedly referred to the military judge's instructions and implored the members to follow the law. He did not tie the theme of "rendering justice" to any societal obligation or ask the members to protect the victims. To the extent that trial counsel suggested that the verdict would set things right, we find that trial counsel was simply telling the members to follow the law. This tactic was appropriate. In addition, this was not an argument that would inflame the passions of the court members. *See United States v. Marsh*, 70 M.J. 101, 102 (C.A.A.F. 2011). As such, we are confident Appellant was not prejudiced by this argument.

Appellant further argues trial counsel improperly invoked the Air Force's training on sexual assault, specifically the "believe the victim" portion of the training. The basis for Appellant's argument is that, after referring to the members' duty to determine the believability of all witnesses, trial counsel suggested that they must decide whether A1C ML was lying or making an innocent mistake. Trial counsel then argued that "if you are firmly convinced in your gut, in your soul, in your mind that she is not pure evil, and that she is not a liar, then you must convict." As an initial matter, trial counsel neither referred to the "believe the victim" training, nor do we find that the argument otherwise inferred or invoked Air Force training regarding sexual assault prevention as a method to induce the members to disregard the law. As to the credibility of A1C ML, trial counsel was referencing the military judge's own instructions on the members' duty to determine the believability of the witnesses.

We are, however, troubled by trial counsel's suggestion that if the members were unable to conclude that A1C ML was not a "liar" and "pure evil," that they must convict. As noted within the beyond-a-reasonable-doubt instruction, the members are only required to convict if they find Appellant guilty of each element of a crime beyond a reasonable doubt. If they do not, they must acquit. To the extent that trial counsel's argument is contrary to this fundamental principle, it is not legally correct. It also appears to set up a false dichotomy—that an acquittal is only appropriate if A1C ML lied and is pure evil, and a conviction equates to a finding that A1C ML did not lie and is not pure evil. Whether A1C ML was a liar or "pure evil" were not elements of the offense, and were entirely irrelevant to whether Appellant was reasonably mistaken as to consent. As such, this argument was error.

Nevertheless, this argument was a few sentences toward the beginning of an argument that spanned 39 pages in the record of trial. Trial counsel did not dwell on the argument and, on varying occasions, reiterated the correct instructions on when the members must acquit or convict. In addition, the military judge repeatedly instructed the members that, if the Government failed to prove each element beyond a reasonable doubt, then they must acquit. Apparently, the members followed this instruction when they acquitted Appellant of all charges relating to Ms. JD. In the context of the entire argument, including that Appellant did not object, we conclude that Appellant was not prejudiced by this erroneous portion of the argument. *See United States v. Pabelona*, No. 16-0214/NA, 2017 CAAF LEXIS 58, at *7–8. "[W]e are 'confident that the members convicted [Appellant] on the basis of the evidence alone.'" *Sewell*, 2017 CAAF LEXIS 59, at *14 (quoting *Hornback*, 73 M.J. at 160).

Finally, Appellant contends even if none of the alleged errors entitle him to relief, he is nevertheless entitled to relief under the cumulative error doctrine. We review such claims de novo. *United States v. Pope*, 69 M.J. 328, 335 (C.A.A.F. 2011). Cumulative error occurs when "a number of errors, no one perhaps sufficient to merit reversal, in combination necessitate the disapproval of a finding." *Id.* (quoting *United States v. Banks*, 36 M.J. 150, 170–71 (C.M.A. 1992)). "Assertions of error without merit are not sufficient to invoke this doctrine." *United States v. Gray*, 51 M.J. 1, 61 (C.A.A.F. 1999). We will reverse the proceedings only if we determine the cumulative errors denied the appellant a fair trial. *See Pope*, 69 M.J. at 335.

Here, Appellant was acquitted of all charges involving a third victim. After considering trial counsel's comments, taken as a whole, we are convinced that Appellant was convicted on the basis of the evidence alone. Thus, we do not grant Appellant relief under this theory.

**G. Victim's Unsworn Statement in Sentencing**

Pursuant to *Grostefon*, 12 M.J. 431, Appellant argues the military judge erred in permitting A1C ML and SA AD to submit unsworn statements in sentencing. We disagree, concluding as this court has done in previous cases that the military judge did not abuse his discretion in permitting sentencing evidence in this manner under the facts of this case. *See United States v. Rowe*, No. ACM 38880, 2017 CCA LEXIS 89 (A.F. Ct. Crim. App. 8 Feb. 2017) (unpub. op.) (holding the military judge did not abuse his discretion when permitting a victim to submit an unsworn statement in sentencing); *see also United States v. Wareham*, No. ACM 38820, 2016 CCA LEXIS 609 (A.F. Ct. Crim. App. 20 Oct. 2016) (unpub. op.).

As to the substance of the unsworn statements, however, we do have two concerns worthy of mention. First, we are concerned about the portion of SA AD's unsworn statement that referenced Appellant's uncharged conduct toward SA AD during their relationship. SA AD told the members that, "[w]hen I began to write this impact statement, I thought about all the other experiences with [Appellant] that you did not get to hear about, but which were equally terrifying and which . . . would have even more clearly exposed [Appellant's] true character." She did not further disclose what those other experiences might have been with Appellant.

This portion of the unsworn statement that references "other experiences" not directly relating to or resulting from the charged offenses is problematic as it exceeded the scope of R.C.M. 1001(b)(4). Nevertheless, the military judge did provide a curative instruction. *Cf. United States v. Barrier*, 61 M.J. 482, 485 (C.A.A.F. 2005) (recognizing that in most cases the military judge's instructions could serve to place inadmissible portions of an accused's unsworn statement in context). The military judge told the members:

> In relation to the statement of [SA AD], in as much as it references uncharged conduct, you may not speculate about the veracity of the nature of such conduct. You should focus, in relation to [SA AD], on the impact of the charged offenses not on the potential impact of unknown uncharged offenses.

Under the facts of this case, we find the military judge's curative instruction was adequate to obviate any prejudice to Appellant by SA AD's unsworn statement. In so holding, we note that no specific instances of these "other experiences" were included within the unsworn statement. Furthermore, the military judge instructed the members not to speculate about what those experiences might have been and directed the members to instead focus on the impact of the charged offenses in determining an appropriate punishment.

Second, it does not appear that the military judge conducted a balancing test under Mil. R. Evid. 403. *See United States v. Carter*, 74 M.J. 204, 206–07 (C.A.A.F. 2015) (the admission of sentencing evidence is subject to the Mil. R. Evid. 403 and the substantive law and procedures set forth in R.C.M. 1001.). Accordingly, we give the military judge less deference. Though the military judge did not conduct a Mil. R. Evid. 403 balancing test, our review of the record reveals that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice to Appellant. The military judge provided an appropriate general instruction to the members on how to assess unsworn statements, as well as a specific curative instruction regarding the uncharged misconduct discussed in the statement from SA AD. We presume the court members followed the military judge's instructions. *See United States v. Stewart*, 71 M.J. 38, 42 (C.A.A.F. 2012). We find no evidence that the members were unable to consider the unsworn statements in their proper context or that they did not follow the military judge's instructions.

## H. Sentencing Instruction and Argument

Appellant's initial brief to this court alleged the prosecution committed prejudicial error during its sentencing argument. The errors identified included trial counsel referencing Appellant's lies to investigators to suggest Appellant's lack of remorse, and purportedly arguing that the members should sentence Appellant more harshly because he exercised his right to trial by court-martial and to confront witnesses against him.[12]

After our initial review of the record of trial, we specified an issue as to whether the military judge erred when instructing the panel members during sentencing that Appellant's status as an AFOSI agent could be considered as a matter in aggravation. We also asked whether, if the instruction was given in error, the prejudicial impact on Appellant was exacerbated by trial counsel's sentencing argument that Appellant should be held to a "higher standard" because of his position as an AFOSI agent. The latter concern identified by this court was not part of Appellant's initial complaint about the appropriateness of trial counsel's sentencing argument.

For the reasons discussed in more detail below, we find the military judge did not err in providing the sentencing instruction in this particular case. As to the propriety of trial counsel's sentencing argument, we find the "higher

---

[12] Pursuant to *Grostefon*, 12 M.J. 431, Appellant also requested that this court consider portions of the sentencing argument that Appellant asserts were misstatements of the evidence. We did so and find that it was proper argument.

standard" argument was erroneous. However, we find Appellant suffered no prejudice from this argument.

### 1. Status of an AFOSI Agent as an Aggravating Factor

Prior to sentencing argument, the military judge provided counsel with his intended sentencing instructions. The Defense objected to the portion of the instructions regarding the use of Appellant's status as an AFOSI agent for evidence in aggravation. The following discussion ensued:

> DC: The objection is to . . . the inclusion of status as an OSI agent as an aggravator. We—our position is that the duty status of [Appellant] is not an appropriate aggravator.
>
> MJ: Trial Counsel.
>
> TC: Your Honor, I believe that it is an appropriate aggravator and fair instruction on the law to the members. It is not an impermissible consideration for them, particularly in light of his—the dereliction of duty charge—all the charges, Your Honor, but particularly the charges that occurred while he was a credentialed OSI agent.
>
> MJ: And particularly the dereliction of duty charge, Defense Counsel, and frankly the obstruction of justice charge in an OSI facility. I think it's fair to characterize that as an aggravator. And so your objection is noted; it's overruled.

During argument, trial counsel raised Appellant's status as an AFOSI agent and discussed the corresponding standards of conduct Appellant agreed to follow:

> TC: *And what makes this all worse? He was an OSI agent.* An OSI agent trained to investigate crimes. By his own admission, trained to investigate sexual assaults, to understand how victims tick. Now, *when he became an OSI agent he agreed to a code above our core values, a set of standards in addition to integrity and service before self and excellence in all that we do—*
>
> DC: Objection. Facts not in evidence.[13]
>
> MJ: Trial Counsel?

---

[13] Although the basis for this objection was facts not in evidence, we find the Defense, through their previously raised objection regarding the military judge's proposed sentencing instructions, adequately preserved their complaint that Appellant's duty status was not a proper matter in aggravation.

TC: Your Honor, *I'm just talking generally about the standards of being an OSI agent.*

MJ: With that in mind, I'll overrule the objection. Members of the court, just remember arguments of counsel, of course, are how they view the evidence and they are to assist you in your deliberations. You may proceed.

TC: Thank you, Your Honor.

TC: He agreed to serve and protect. He agreed to uphold the law. He agreed to investigate crimes. *He agreed to meet higher standards.* And you've seen his training records from OSI; he displayed a very strong initial rapport, choice questions, control of subjects during denials. He has a very good investigative mindset. Expect great things from this agent. He violated every one of those standards, every one of those expectations when he assaulted, stalked, and threatened [SA AD]. He doesn't care about the code. He doesn't care about standards or rules or law. What we view as objective standards by which society functions, he views as something to completely ignore and that's what makes him so dangerous.

(Emphasis added).

At the conclusion of the sentencing arguments, the military judge instructed the members on what they should consider in determining an appropriate punishment. In doing so, the military judge elected to include a list of factors the members should consider generally, as well as specific factors that they should consider as aggravating evidence:

In selecting a sentence, you should consider all matters in extenuation and mitigation as well as those in aggravation, whether introduced before or after findings. Thus, all the evidence you have heard in this case is relevant on the subject of sentencing.

You should consider evidence admitted as to the nature of the offenses of which the accused stands convicted, plus the accused's combat and deployment record; the prior honorable discharges of the accused; the duration of the accused's pretrial confinement or restriction; the accused's [enlisted performance reports]; the medals and awards worn by the accused; and the lack of any previous convictions.

*In aggravation you should consider* the impact of these crimes on the victims, the fact that his victims were also Air Force

members, *his status as an AFOSI agent at the times of the crimes*, and his status as an NCO.

(Emphasis added).

In his brief on the specified issue, Appellant concedes some of the offenses of which he was convicted involved, in some way, his status or position as an AFOSI agent. However, given most of his offenses, including the assaultive conduct, were not connected or directly related to his duties as an AFOSI agent, Appellant suggests the military judge's instruction should have specifically limited the use of his duty status to only certain offenses. In so arguing, Appellant acknowledges the Defense did not ask for a tailored instruction which limited the panel's consideration of this information.

A military judge is required to give the court members appropriate instructions on sentencing. R.C.M. 1005(a); *see also United States v. Wheeler*, 38 C.M.R. 72, 74–75 (C.M.A. 1967) ("[T]his Court has always insisted the members be furnished with adequate guidance regarding the exercise of their discretion in reaching an appropriate punishment."). The instructions must include a "statement that the members should consider all matters in extenuation, mitigation, and aggravation, whether introduced before or after findings." R.C.M. 1005(e)(5). We review a military judge's decision to give a sentencing instruction for an abuse of discretion. *United States v. Hopkins*, 56 M.J. 393, 395 (C.A.A.F. 2002).

R.C.M. 1001(b)(4) provides that any aggravating circumstances "directly relating to or resulting from the offenses of which the accused has been found guilty" can constitute aggravation evidence. This court has repeatedly held that an accused's duty position, without something more, cannot be considered as a matter in aggravation to increase a sentence. *See United States v. Bobby*, 61 M.J. 750 (A.F. Ct. Crim. App. 2005); *United States v. Collins*, 3 M.J. 518 (A.F.C.M.R. 1977), *aff'd*, 6 M.J. 256 (C.M.A. 1979). However, when the record demonstrates some "reasonable linkage or manner in which the offense was facilitated by the duty position or the duty position was somehow compromised by the offense," a service member's duty position can be considered as evidence in aggravation. *Bobby*, 61 M.J. at 755. Whether or not a circumstance is directly related to or results from the offenses calls for considered judgment by the military judge, and is not to be overturned lightly. *United States v. Wilson*, 47 M.J. 152, 155 (C.A.A.F. 1997) (citing *United States v. Jones,* 44 M.J. 103, 104–05 (C.A.A.F. 1996)).

The military judge's ruling as documented above is unclear regarding the legal test he applied in ruling for the Government. On one hand, the ruling suggests that if duty status is connected to at least one charged offense, a broad instruction that allows for the consideration of duty status for all offenses is authorized. Conversely, based on the Government's proffer, one

could read the military judge's ruling as requiring "linkage" to all of the charged offenses before issuing the broad instruction as was given in this case. We hold that the latter analysis is the correct interpretation of the law. *See, e.g., United States v. Barnett*, 70 M.J. 568, 572 (A.F. Ct. Crim. App. 2011), *aff'd*, 71 M.J. 248 (C.A.A.F. 2012) (noting that military judges have a duty during sentencing to tailor instructions to the members based on the law and the evidence); R.C.M. 1005(a), Discussion. As such, to the extent the military judge did not find all of the offenses were connected to Appellant's duty status, he erred by not tailoring an instruction to the members on the appropriate use of this evidence for aggravation.

As Appellant conceded in his brief, his dereliction of duty and obstruction of justice offenses were facilitated by his duty position or his duty position was somehow compromised by the offenses. Thus, our analysis must only examine the offenses involving Appellant's two victims, A1C ML and SA AD. We find, based on our independent review of this case, that there was sufficient evidence before the military judge to merit a broad duty status instruction encompassing all of Appellant's charged offenses. Appellant's status as an AFOSI agent was interwoven with aspects of the offenses involving both of these victims.

With regard to A1C ML, she testified her initial reluctance to file an unrestricted report of sexual assault was due to her concerns about Appellant's status as an AFOSI agent. A1C ML also testified regarding an incident a few days prior to the charged sexual assault where Appellant threatened to end her military career if she left him. Appellant, in an attempt to give credibility to this threat, informed A1C ML that he knew everyone on base—presumably because of his position as an AFOSI agent. Appellant's efforts to use his position to influence A1C ML's reporting provides the sufficient linkage necessary to list Appellant's duty status as a matter in aggravation as it applies to the offenses involving A1C ML.

As to SA AD, we also find a sufficient connection to support the instruction as given by this military judge. Appellant had been SA AD's supervisor within AFOSI, and it was a fair inference their sexual relationship originated from their professional working relationship. *See United States v. Alis*, 47 M.J. 817, 826 (A.F. Ct. Crim. App. 1998) (finding ample evidence a staff judge advocate's on-duty position facilitated an inappropriate off-duty relationship with a subordinate). SA AD testified she eventually told Appellant she was only staying in the relationship with him because she knew he would make her professional life difficult if she discontinued it. At some point in their relationship, Appellant threatened to expose SA AD's mishandling of a confidential source. Although this threat was not directly connected to Appellant's crimes against SA AD, it is evidence of Appellant using his duty position in

an attempt to control the victim's behavior, including her willingness to maintain an abusive relationship with Appellant or to report his misconduct.

Appellant also implied that he could hurt SA AD's career if she provided information after he came under investigation for sexual assault. Specifically, Appellant informed SA AD that he had "dirt" on everybody and that she would be smart not to say anything. In doing so, Appellant implied SA AD would suffer negative consequences if she cooperated with authorities. Appellant also was convicted of placing a marksmanship sighting target on SA AD's residence doorstep in an attempt to threaten her or intimidate her from reporting his misconduct. As with Appellant's expressions to ruin SA AD's professional reputation, his efforts to influence her cooperation with law enforcement further bring into relevance his duty status as an AFOSI agent. Given our belief Appellant's offenses involving his two victims were sufficiently facilitated by his duty position, we find the challenged instruction was not erroneous.

### 2. Improper Sentencing Argument: "Higher Standard"

Because of our determination regarding the use of Appellant's duty status as evidence in aggravation, we look at the Government's "higher standard" argument through a different lens than that of the dissent below. While we agree the Government's argument was improper, we do not subscribe to the overarching concerns raised by the dissent when examining the level of prejudice derived from this argument.

Improper argument involves a question of law that this court reviews de novo. *Sewell*, 2017 CAAF LEXIS 59, at *10. "The legal test for improper argument is whether the argument was erroneous and whether it materially prejudiced the substantial rights of the accused." *Baer*, 53 M.J. at 237.

Trial counsel is entitled "to argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence." *Id.* However, it is error for trial counsel to make arguments that "'unduly . . . inflame the passions or prejudices of the court members.'" *Marsh*, 70 M.J. at 102 (alteration in original) (quoting *Schroder*, 65 M.J. at 58); R.C.M. 919(b) Discussion.

Here, trial counsel's use of Appellant's duty status during argument exceeded what is authorized as a matter in aggravation. Instead of limiting comments to how Appellant used his AFOSI training, expertise, and position to facilitate his misconduct or manipulate his victims, trial counsel argued that the members should hold Appellant to a "higher standard" because "when he became an OSI agent he agreed to a code above our core values."

This argument was improper. We have never held that an accused could be punished more harshly solely because of the nature of his official duties or military position. This portion of trial counsel's sentencing argument focused

on Appellant's duty status as an aggravating factor without adequately connecting the position to the specific offenses before the members. Consequently, it was improper for trial counsel to argue Appellant should be held to higher standards simply because of his assigned career field.

Improper sentencing argument does not, however, automatically warrant relief. Relief will be granted only if the trial counsel's misconduct "actually impacted on a substantial right of an accused (i.e., resulted in prejudice)." *Fletcher*, 62 M.J. at 178. Reversal is only appropriate in this setting if "the trial counsel's comments, taken as a whole, 'were so damaging that we cannot be confident that [the appellant] was sentenced on the basis of the evidence alone.'" *United States v. Frey*, 73 M.J. 245, 249 (C.A.A.F. 2014) (quoting *United States v. Halpin*, 71 M.J. 477, 480 (C.A.A.F. 2013)).

We balance three factors to assess whether improper argument has resulted in prejudice: "(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction[s]." *Sewell*, 2017 CAAF LEXIS 59, at *11 (quoting *Fletcher*, 62 M.J. at 184); *Halpin*, 71 M.J. at 480 (extending the *Fletcher* test to improper sentencing argument).

Contrary to the dissent, we find Appellant was not prejudiced by this argument. In examining the severity of the error, we note the two "higher standard" references constituted a relatively small portion of a 16-plus page argument. The vast majority of the argument properly focused on matters in aggravation, including Appellant's use of his position, knowledge, and expertise as an AFOSI agent to facilitate his criminal activity. Moreover, contrary to the general concerns raised by the dissent below, trial counsel made no attempt to validate or reinforce his limited "higher standard" argument by linking the argument to the military judge's sentencing instructions. Trial counsel also invoked Appellant's knowledge of sexual assault offenses as an investigator to argue he was keenly aware of legal boundaries, but was still not deterred from committing the crimes he was convicted of in this case. We find these arguments appropriate as they directly related Appellant's duty status to his individual crimes. Finally, in arguing for specific punishments, trial counsel argued Appellant should be reduced in rank to show "that OSI agents are to be held to the same standard as every other Airmen." Restricting this argument to whether Appellant should be reduced in rank—and that he should be held to the *same* standard as opposed to a higher one—reduces the severity of the misconduct. Overall, the relatively few and isolated improper comments weigh heavily against finding prejudice.

As to the second prong, the military judge did not provide a sua sponte correction or a limiting instruction for the portion of the argument we have identified as improper. This omission is not surprising given the Defense's

objection to the argument was based on facts not in evidence. Still, this factor slightly favors a finding of prejudice.

As to the final prong, we find that the weight of the evidence supports the sentence imposed. Appellant's crimes were egregious. They involved multiple victims and documented a desire by Appellant for control and dominance. The Government argued the members should impose a sentence of at least 40 years of confinement, reduction to E-1, total forfeitures, and a dishonorable discharge. The Defense, on the other hand, countered that the members should impose no more than five years of confinement. The members eventually imposed a sentence of 30 years of confinement.

We recognize that, while Appellant's criminal conduct was substantial, the adjudged punishment in this case was toward the higher range of punishments seen for similar allegations with similar facts and circumstances. Nevertheless, it was within the range of punishments seen and again, given the circumstances of this case, the evidence supported the higher-end punishment. Overall, we find this factor weighs against a finding of prejudice.

After considering the *Fletcher* factors together and all facts and circumstances of this case, we find Appellant was not prejudiced by the Government's improper sentencing argument that suggested Appellant be held to a "higher standard" simply because of his status as an AFOSI agent.

### 3. Other Improper Sentencing Argument

In addition to the question specified by the court, Appellant also challenged other portions of the Government's sentencing argument. Specifically, Appellant asserts trial counsel erred in arguing Appellant's lies to investigators were evidence of his lack of remorse, as well as suggesting the members should sentence Appellant more harshly because he exercised his right to trial and to confront witnesses against him. Appellant did not object at trial to these specific comments. We find that, in the context of the entire argument, those portions challenged by Appellant were not error, and, even assuming error, were neither clear nor obvious.

On one occasion during its lengthy sentencing argument, the Government argued that Appellant "has shown no remorse. When he was given the opportunity to come clean in his subject interview he lied." As this pertained to the offenses on which Appellant was convicted, and it was admitted in sentencing, the members were permitted to consider it for any appropriate purpose. *See* R.C.M. 1001(f)(2). Our superior court has held that "other evidence in the record may . . . give rise to the inference that an accused is not remorseful, but the inference may not be drawn from his decision not to testify or from his pleas of not guilty." *United States v. Paxton*, 64 M.J. 484, 487 (C.A.A.F. 2007). Appellant's lack of remorse is relevant to his rehabilitation potential.

Appellant also alleges that trial counsel inappropriately argued that the members should punish Appellant more severely for exercising his right to trial and his right to confront the witnesses against him. As to SA AD, Appellant asserts the following portion of the argument constituted plain error:

> [SA AD] was ordered to be here. She didn't want to testify against him. She didn't want to testify against him, despite his depravity, despite his utter disregard for her and everything that she is, everything she stands for, everything she believes in. She cares for him. She didn't want to hurt him because she has empathy, even for him.
>
> Her phone was seized, her motives were questioned, she was forced to relive one of the worst experiences of her life over and over and over again for co-workers, for her headquarters, for government prosecutors and defense attorneys, and for you. And you recognized that the crimes he perpetrated against her were just that, crimes. Morally[ ] reprehensible acts that society condemns. Make your sentence match it. Make it worth the trauma she has had to go through at his hands. Confine him for at least 40 years so that she understands that you understand that the Air Force understands her pain. Make her understand that everyone in this uniform understands that what he did to her was one of the hardest experiences she has ever gone through in her life.

Later in the argument, after discussing aggravating aspects of the sexual offenses against the other victim, the Government argued:

> [A1C ML] went through what is probably the worst experience of her life on the 4th of September and then she went through the second worst one the next day when she was having her SAFE kit completed. And she has had to relive it every time she has stepped into this courtroom, every time she has met with the defense counsel or the trial counsel, every time she has sat in the room with the man who brutalized her.

It is permitted in certain circumstances for the Government to elicit limited testimony in sentencing about the negative impact of the trial proceedings on the victim. *See United States v. Stephens*, 67 M.J. 233, 236 (C.A.A.F. 2009) ("[T]here was no explicit comment by the trial counsel or the father concerning Appellant's invocation of his rights but rather, a brief reference to the effect of the entire process (including, but not limited to, the trial) on Appellant's victim."). In determining whether an argument crosses the line from permissible to impermissible, it is critical to consider the comments within the context of the entire argument.

After examining the entire sentencing argument, we conclude the Government's argument neither had the intent, nor the effect, of suggesting that Appellant should be punished for exercising his constitutional rights. This conclusion is strengthened by the Defense's lack of objection. The Defense was engaged throughout the trial, to include objecting to other portions of the Government's argument. As such, the Defense's silence speaks volumes, especially considering these now challenged statements were brief and buried within a lengthy argument that otherwise emphasized the severity of the crimes and surrounding facts and circumstances of those crimes. For these reasons, we reject this assignment of error.

## I. Sentence Appropriateness

Pursuant to *Grostefon*, 12 M.J. 431, Appellant argues that his sentence was inappropriately severe. We disagree.

This court reviews sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006). "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offenses, the appellant's record of service, and all matters contained in the record of trial." *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009). Although we are accorded great discretion in determining whether a particular sentence is appropriate, we are not authorized to engage in exercises of clemency. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010).

Among other offenses, Appellant was convicted of two separate sexual assaults of two different victims within days of one another. One of his victims, A1C ML, recounted thinking she was going to die during the attack. Moreover, in addition to sexually assaulting SA AD, Appellant also threatened her career and stalked her, to include leaving a weapons target with bullet holes through it on her doorstep.

We also note the maximum punishment in Appellant's case included life in prison. The adjudged sentence of 30 years of confinement was less than the maximum, and even 10 years less than that argued by the Government.

We have given individualized consideration to Appellant, the nature and seriousness of the offenses, Appellant's record of service, and all other matters contained in the record of trial. We find that the approved sentence of dishonorable discharge, 30 years of confinement, forfeiture of all pay and allowances, and reduction to E-1 was within the discretion of the panel and the convening authority, was legally appropriate based on the facts and circumstances of this particular case, and was not inappropriately severe.

## J. Timely Appellate Review

We note that Appellant's case was docketed with this court on 26 February 2015, meaning more than 30 months have passed between docketing and

this opinion. We review de novo claims that an appellant was denied his due process right to a speedy post-trial review and appeal. *Moreno*, 63 M.J. at 135. When appellate review is not completed within 18 months, such a delay is presumptively unreasonable and triggers an analysis of the four factors laid out in *Barker v. Wingo*, 407 U.S. 514 (1972). *See United States v. Arriaga*, 70 M.J. 51, 55 (C.A.A.F. 2011). Those factors are: (1) the length of the delay, (2) the reasons for the delay, (3) Appellant's assertion of the right to timely review and appeal, and (4) prejudice. *Moreno*, 63 M.J. at 135.

Having analyzed these factors, we find the delay in rendering this opinion does not constitute a due process violation. Appellant had not asserted his right to timely review until very late in the appellate process.[14] Regarding the reasons for the delay, this case involved unusually voluminous and complex issues. The transcript consisted of 1,851 pages and the record of trial filled 30 volumes. The appellate record itself consumes an entire volume. Appellant's submissions, raising a total of 21 issues, were not filed with the court until 22 February 2016, 12 months after the case was docketed. Because Appellant raised issues of ineffective assistance of counsel, this court required affidavits from the trial defense counsel. The Government's filed its answer on 3 June 2016. Appellant filed his reply on 1 July 2016. After reviewing the briefs and the entire record of trial, this court specified another issue for briefing. Those briefs were not filed until 31 August 2016.

There has also been no prejudice to Appellant because of the delay. The extended briefing schedule allowed this court to fully review Appellant's assignments of error and specify an additional issue. When there is no showing of prejudice under the fourth factor, "we will find a due process violation only when, in balancing the other three factors, the delay is so egregious that tolerating it would adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). That is not the case here.

Therefore, Appellant is not entitled to relief based on the fact that more than 18 months elapsed after docketing until today's opinion. We have also considered whether Appellant is due relief under *United States v. Tardif*, 57 M.J. 219, 223–24 (C.A.A.F. 2002). Applying the factors set out in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we find Appellant is not entitled to relief.

---

[14] Appellant first raised the issue of timely appellate processing in a supplemental assignment of error filed on 6 March 2017 pursuant to *Grostefon*, 12 M.J. 431. We granted the motion and considered Appellant's arguments therein.

## III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of the appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and the sentence are **AFFIRMED**.

J. BROWN, Senior Judge (concurring in part and dissenting in part):

I join my esteemed colleagues in all but their conclusion that Appellant was not prejudiced by the Government's status-based sentencing argument and that, under the facts of this case, the military judge's instruction regarding Appellant's duty position did not constitute error. I instead conclude that trial counsel's improper argument prejudiced Appellant and the military judge's incomplete and misleading instruction reinforced trial counsel's flawed argument and exacerbated the prejudice to Appellant from that argument. Accordingly, I would set aside the sentence and authorize a rehearing.

This court has long cautioned practitioners of the danger inherent in arguing duty status as an aggravating factor in sentencing. We have repeatedly held that an accused's professional duties were a matter in aggravation only when they directly related to the offenses of which the accused has been found guilty. *See United States v. Bobby*, 61 M.J. 750, 755–56 (A.F. Ct. Crim. App. 2005) (finding military judge erred by considering accused's status as F-117 crew chief as aggravating factor in drug case); *United States v. Gruninger*, 30 M.J. 1142, 1143 (A.F.C.M.R. 1990) (holding aircraft maintenance duty was not an aggravator in drug case); *United States v. Moore*, 6 M.J. 661, 663 (A.F.C.M.R. 1978) (finding error for trial counsel to argue an accused's job as a medical technician as an aggravator in drug case); *United States v. Collins*, 3 M.J. 518, 520–21 (A.F.C.M.R. 1977) (holding it was improper to argue that security forces member violated a trust through drug use where the crime was not facilitated by the duty status).

This principle was first set forth and discussed by this court in *Collins*. There, we found error in trial counsel's attempt to connect the accused's duty position with the charged drug offense. In his presentencing argument, the trial counsel stated:

> Airman Collins, in setting up the sale by establishing the price, quantity, the time and the place, violated basically a trust he has with this base. He was in security. It was his responsibility to protect the most lethal weapons which we have in our arsenal. This is someone who is supposed to be protecting them.

> And the day before he starts his duties in the [Security Alert
> Team], he sells LSD.

*Collins*, 3 M.J. at 519 (alteration in original). Despite Collins being assigned to security forces and also selling drugs, we held there was nothing in evidence to suggest that his duty position was connected to the offense committed. There was, therefore, no legitimate inference that Collins's misconduct violated a special trust. The court explained:

> His sale of LSD was in no demonstrable way facilitated by his
> status, nor was there any evidence that he abused such status
> in committing the offense. In short, the trial counsel had no
> justifiable basis for his argument that the accused's member-
> ship in the security police unit (as opposed to any other organi-
> zation) was an aggravating circumstance.

*Id*. at 520–21. This rationale was later summarized as: "[O]ne's duty position, without linkage to the commission of the offense, is not proper evidence in aggravation for consideration by the members during sentencing deliberations." *United States v. Rhodes*, 64 M.J. 630, 631 (A.F. Ct. Crim. App. 2007), *aff'd*, 64 M.J. 630 (C.A.A.F. 2007). Accordingly, a trial counsel's argument that an accused should be held to a higher standard based upon their duty position, or a suggestion that they should be punished more harshly solely because of their position, is an argument fraught with danger.

As to these general principles, the majority does not question, and I join them in their conclusion that the portion of the Government's sentencing argument that asserted Appellant should be held to a higher standard because of his duty position was error. Unlike the majority, however, I conclude that the improper argument prejudiced Appellant. The insufficient measures to cure the error, as well as the weight of the evidence supporting the sentence, support my conclusion of prejudice.

Measures to Cure the Error: The military judge overruled the Defense's objection and permitted the Government's duty status/higher standard argument. This alone was problematic in the context of this case. What propels this case even further toward prejudice was the military judge's subsequent sentencing instructions to the members. The military judge magnified the impact of this erroneous argument with a misleading and incomplete instruction advising the members simply, in a conclusory manner, that Appellant's duty position was an aggravating factor. This omitted further instruction that Appellant's sentence could not be increased solely because of his duty position (something that the Government effectively argued) or that they could only consider his duty status to the extent that they determine Appellant used or facilitated his position to commit a particular crime (a limitation on how duty position can be used).

This sentencing instruction was done under the auspices of the requirement that military judges provide additional guidance to members so they have sufficient guidance in determining an appropriate sentence. In *United States v. Wheeler*, 38 C.M.R. 72, 74–75 (C.M.A. 1967), our superior court first considered the necessity of providing sufficient guidance to members in sentencing. There, the military judge had merely instructed on the maximum sentence without advising the members about mitigation and extenuating evidence, the possibility of a punishment less than the maximum, or the effect of a guilty plea. *Id.* at 74. The court, however, was wary of the vast discretion for sentencing vested in court members, a discretion unlike that found with civilian juries.[15] In *Wheeler*, the court concluded that the mere recitation of the maximum punishment neither highlighted for the panel that they had the authority to provide less than the maximum punishment, nor did it advise them that they should consider mitigating, extenuating, and aggravating circumstances in reaching an appropriate punishment. *Id.* at 76–77.

This court revisited this issue in *United States v. Hopkins*, and recognized that, rather than providing a laundry list of facts the members should consider, it was instead preferable to provide more generalized guidance to the members and then allow counsel to argue the significance of the facts and whether those facts should be considered as mitigating, extenuating, or aggravating. 55 M.J. 546, 550 (A.F. Ct. Crim. App. 2001), *aff'd*, 56 M.J. 393 (C.A.A.F. 2002). As we explained then, "[i]t is the duty of the counsel at trial to bring to the attention of the court members, through their arguments, any aggravating, mitigating, or extenuating factors." *Id.* Consequently, *Hopkins* suggested, in non-capital cases, the following instruction:

> In determining the sentence, you should consider all the facts and circumstances of the offense(s) of which the accused has been convicted and all matters concerning the accused (whether presented before or after findings). Thus, you should consider the accused's background, his/her character, his/her service record, (his/her combat record,) all matters in extenuation and mitigation, and any other evidence he/she presented. *You should also consider any matters in aggravation.*

*Id.* (Emphasis added). As the *Hopkins* instruction avoided highlighting particular case-specific facts, it avoided the potential appearance of a military judge expressing an opinion as to whether, and to what extent, the members

---

[15] In the case before us, for example, members with little criminal or military justice experience were authorized to impose a punishment that ranged anywhere from no punishment to confinement for life without the possibility of parole.

should characterize certain facts as either favorable to the Government or to the accused. That was instead left to the advocacy of counsel.

In this case, unfortunately, the military judge inadvertently magnified trial counsel's error when he modified the *Hopkins* instruction to include a list of specific facts that the military judge found aggravating in this case.[16] His laundry list to the members included Appellant's "status as an AFOSI agent at the times of the crimes."

As this court has previously made clear, it is permissible for counsel to argue duty status in only a very limited manner where the commission of the crime is sufficiently tied to the accused's duty status. This is to minimize the likelihood that the members misuse this information and punish an accused solely because of his duty title or position. This concern is not at all minimized, however, where the military judge chooses to advise the members that duty position is an aggravating factor without properly advising the members on the limits of that use.[17]

I find that this instruction reinforced trial counsel's erroneous duty-status/higher-standard argument by suggesting that it was not only permissible, but that the members *should* consider Appellant's duty position, without limitation or reservation, as an aggravating factor for sentencing. Though there was no requirement for the military judge to identify any particular fact as aggravating, if he chose to do so, he was under an obligation to fully and completely advise the members of the limitations on how this evidence could be used by them. *Cf. United States v. Wallace*, 13 M.J. 278, 282 (C.M.A. 1982) (finding that though an accused lying under oath is probative to his potential rehabilitation, the military judge must properly instruct the members on the appropriate use of this evidence—namely that the members may only consider it if they determine the accused made a willful and intentional lie—

---

[16] It does not appear from the record that either Appellant or the Government requested that the military judge highlight any particular facts in his instructions. The military judge sua sponte presented his proposed instruction to counsel prior to their argument, and the military judge subsequently provided, over Defense objection, the judge's draft instruction to the members after argument.

[17] Much of this could have been avoided, and any prejudice minimized, had the military judge refrained from setting forth specific facts that he personally believed constituted aggravating factors. A better approach is the one we previously set forth in *Hopkins*, where we recognized that it was preferable for counsel—rather than the military judge—to argue to the finder of fact the significance of the different factors present in a particular case and whether those factors constituted aggravating, mitigating, or extenuating evidence.

and even then, they must only consider it to the extent it is relevant to the accused's rehabilitative potential; the members should be specifically instructed that, under no circumstances, are they authorized to mete out additional punishment for the accused's lie). As this court has previously noted, "the prohibition against using an accused's duty position to increase a sentence is so well established in Air Force trial practice that it is tantamount to black letter law." *Rhodes*, 64 M.J. at 631. As the military judge failed to sufficiently tailor his modified instruction, he further reinforced and validated the Government's erroneous "higher standard" argument.

Under the unique facts and circumstances of this case, where trial counsel previously made an improper argument suggesting that Appellant should be held to a higher standard because of his status as an AFOSI agent, the military judge's subsequent instruction to the members that they should consider Appellant's status as an AFOSI agent as an aggravating factor, both reinforced this erroneous argument and suggested to the members that Appellant's duty status as an agent was a proper basis to enhance or increase an otherwise appropriate punishment. Merely listing "his status as an AFOSI agent at the times of the crimes" as an aggravating factor was insufficient and misleading in the context of this case. With the military judge's instruction in this case, a reviewing court has no assurances that the members used this factor in an appropriate manner.[18]

Weight of the Evidence: As to the weight of the evidence, I do not share the majority's confidence that it weighs heavily against prejudice. While recognizing that Appellant's criminal conduct was substantial, I also recognize that there were significant extenuating circumstances in this case. For example, as to the sexual assault of SA AD, there was evidence presented that

---

[18] The following instruction would have minimized the impact of the Government's status-based argument: "The evidence presented (and the sentencing argument of trial counsel) raised the question of whether the accused's duty status or official position is matter in aggravation (for the offense(s) of_____). You are instructed that you may only consider this issue as a matter in aggravation insofar as you conclude that the accused's duty status or official position facilitated commission of the offense(s) or was otherwise directly linked to the offense(s). Absent this direct linkage to the offense(s), the duty status or official position of the accused is not a proper matter in aggravation. To the extent that you find a direct linkage to the offense(s), you may not mete out additional punishment solely based on the accused's duty status or official position."

would suggest that, while it may have been an unreasonable belief, Appellant may have personally believed that SA AD consented to the sexual contact. Further, as to the sexual offenses perpetrated against A1C ML, Appellant and A1C ML were involved in a consensual dominant/submissive sexual relationship that incorporated aspects of bondage and physical control. Although Appellant's crimes against A1C ML—on this one evening—went significantly beyond their prior dominant/submissive sexual relationship, it still could be considered by the members as mitigating. Ultimately, the members imposed a sentence of 30 years of confinement, a reduction to E-1, total forfeitures, and a dishonorable discharge. Considering all of the facts and circumstances of these offenses, I am not convinced that the adjudged punishment in this case was not improperly increased because of an improper desire to punish Appellant more severely because he was an AFOSI agent and because of trial counsel's arguments to hold him to a higher standard.

For these reasons, after considering the facts and circumstances of this case, I am persuaded that Appellant was prejudiced by the Government's improper sentencing argument that suggested, in part, that Appellant should be punished more harshly because of his status as an AFOSI agent and the "higher standards" that purportedly accompany that position. The military judge's decision to both overrule the objection without sufficient instruction to the members, and his later decision to advise the members that they *should* consider his status as an agent as an aggravating factor increased the probability that the members inappropriately increased Appellant's sentence based upon that improper argument. The severe sentence adjudged by the members further reinforces this conclusion. Accordingly, I conclude that this portion of trial counsel's sentencing argument materially prejudiced a substantial right of Appellant. As such, I would set aside the sentence and authorize a rehearing on the sentence.

FOR THE COURT

KURT J. BRUBAKER
Clerk of the Court